May it please the court, Timur Askrov on behalf of Kaleb Cole. I would ask to reserve five minutes for rebuttal. All right. I would first like to address Mr. Cole's sufficiency of the evidence claim. It is our position that the evidence in this case was insufficient to convict Mr. Cole of mailing threatening communications, interference with federally protected rights, and conspiracy as charged in the superseding indictment. In order to convict Mr. Cole, the government had the burden of proving beyond a reasonable doubt that the posters that Mr. Cole was accused of distributing amounted to a true threat within the meaning of the First Amendment to the United States Constitution. This court has made clear that in order to prove that a defendant issued a true threat within the meaning of the First Amendment, the government must establish that the statement, and in this case the posters, both objectively rose to the level of a true threat and that the defendant subjectively intended to communicate a true threat, meaning that the defendant subjectively intended to communicate a serious expression of intention to inflict bodily harm upon another person. And can the second be inferred from the first? In other words, I know that you contend these are not objectively true threats, but let's assume that they are objectively true threats. And can't we infer from the fact that they are objectively that there's evidence to support your client's subjective belief? Your Honor, I would respectfully submit that we cannot. I think one example that we can provide is one case we can cite there is Virginia v. Black, for example. And in that case, the Supreme Court talked about, I believe it was a statute that outlined, outlawed cross-burning. And what the Supreme Court said there was that you actually have to have the showing, if you allow the inference, if you allow the inference that the cross-burning is the subjective intent. I think that's what made the statute unconstitutional. But there we had the cross-burning itself not being as you know, you had to infer a statement out of the cross-burning. Here we have communications which say something, assuming that what they say amounts to a true threat. Why shouldn't we, therefore, infer the subjective intent of the person who sent them to communicate that true threat? Your Honor, and I think that you are correct in asserting that we would disagree that objectively they were true. No, I understand. I assume that. But to answer Your Honor's question, I believe in particularly where there is evidence that it was not the speaker's intent to communicate a true threat. That is, to communicate a threat of bodily harm to another person. Where there's evidence of that, I don't believe that that can be inferred. I know you want to focus on the first part, but I'm having some difficulty trying to figure out how cases get proved. Let's assume I write a letter to Judge Wynn, which is a classic true threat. I'm going to come to your house and kill you and kill everybody you know. And then I say, when I'm charged with what appears to be objectively a true threat, I didn't mean it. How's the government supposed to show the second part? I mean, can't it infer the second part from the fact that I sent such a true threat to her? Your Honor, I believe that in the correct circumstances that it may be possible, and I think that the case on that point would be United States v. Bachmeier, and that's the case where it was actually a prisoner who had sent a letter to a judge addressed to a court expressly stating that he was going to kill or threatened to kill the judge's family. Now, in that case, what the court said is it didn't matter whether the instruction on subjective intent was correct because you could infer from that very clear statement. Okay, so if that's true, which I think is the law, why can't I infer from the facts of this case, which are not simply posters because these posters are mailed to specific individuals with their names on them, right? I think that, Your Honor, the distinction is, and I think the distinction to draw is, cases like Bachmeier where there was a very clear statement, cases like United States v. Sutcliffe where the defendant told to, I think it was, a process server said to him expressly, I'm going to kill you. And I think that that inference could not be drawn here because the posters here were much more vague than that. The expressed language of the posters was much more vague. But the government isn't relying solely on the face of the posters. The government also introduced into the record a lot of other evidence, such as the chat logs and the recordings, and I thought from that evidence on the subjective intent requirement that the posters were meant to be threatening, not explicitly threatening, but meant to intimidate, to cause fear, meant to threaten. Your Honor, I think that I would – Tell us where the government falls short with that evidence. And also I'll ask you a second follow-up question as to, to what extent do we consider the fearful reactions of the victim in determining whether it's a true threat or not? And I think those are both very important points. And what I would like to point out, and I think that this is what the government attempts to argue, but I don't think it is the law. I think what the law is that the government's burden is to prove that subjectively the speaker, in this case, we'll say Mr. Cole or AWD, intended subjectively to express a serious expression of intention to inflict bodily harm. Now, it's not enough it's our position that these posters are – I don't think it can be disputed that these posters are scary and intimidating. I think I would analogize to the nightly news. We hear things every night that are intimidating, that cause people to install security systems, that cause people to purchase firearms, take other measures to increase the security of their homes. But that's not enough. It has to be what they actually wanted these statements to say and what the statements actually have. Death to pigs. I'm sorry, Your Honor? Death to pigs, the poster says, and it is mailed to a person. And it says, with swastikas on it, two can play at this game. Why isn't that, on its face, indication, both an objective threat and indication that you intend to pose harm to someone? And even on top of that, the way it's written is exactly the way it was written in the Madsen case. Death to pigs, implying we're going to come to your house and do something to you. And then also, at the same time, he's caught on tape saying things like get dollar store rags and knife them to a tree outside their homes, knife through the head of the doll. That seems like a subjective intent and even an objective intent. And, Your Honor, I think what I would do is I would compare these statements, specifically to the statements in Bagdasarian that were found not to be true threats. One of the statements that was made there was in reference to then-presidential candidate Barack Obama, what the court stated, he's going to have a .50 cal to the head soon. If they had mailed that to Mr. Obama's residence, would it make a difference in your view? I think it's one thing to make irresponsible statements in public or even in private. It's another thing to communicate them to the intended victim. That's what strikes me about this case. If these posters had just been put up on the side of the road or even outside a synagogue, maybe your point would have more purchase with that. But they were mailed to specific individuals with their names on them saying, we know who you are and where you live. Doesn't that take this out of the realm of the cases that you're referring to? Your Honor, I respectfully submit that that is where we have to go to context. And this will touch also on Judge Nguyen's question to me about what was the evidence in this case and why don't the conversations, why don't the undercover recorded conversations, establish that this was, in fact, a true threat. Well, I think that we look to what the intentions were. And when we look to the record, we see that there was a context here. What these posters had stated, what they said was things like two can play at this game. We are watching you. And when we look at the wire chat logs between the poster in the chat communications discussing the posturing campaign, what we see is an express stated intent. And that express stated intent is made clear by Mr. Cameron Shea, who was the organizer of the posturing campaign. And his first message, what he says, is that the purpose of the campaign was to respond to the media's public defamation and to erode the media state's air of legitimacy by exposing the- Let's get to the posters. Shea basically said that Mr. Cole was developing the posters and they were going to be threatening posters. Not explicitly threatening, but they were meant to be threatening posters. And the operation's goal was to send a message, aid in increasing their fear of us, stir them up, and then we intimidate them further. And- All that to me relates to proof of subjective intent. Doesn't it? Your Honor, and yes, it does relate to proof of subjective intent. But I think that we need to look at the context to determine what fear is being created. What this court has said, again, in Bagdasarian, was that this has to communicate the threat that the speaker is actually going to take violent action. And we believe, and it's our position that the evidence shows this, is that that is not what the threat was. There were numerous communications between the members of the wire chat group that talked about specifically doxing. There was- When you have a Molotov cocktail, that's not communicating that you're going to disclose personal information on the Internet. A Molotov cocktail, there's immediate harm there, isn't there? Your Honor, and again, I think that that, again, goes back to the context that these statements were made in. And one of the issues here is that there was even material that AWD had used as recruiting materials that included these sorts of images of Molotov cocktails, of firearms, of other types of weaponry. And this is the type of symbolism that this group used. For example, I would submit in response to Your Honor's question, if there's a recruiting poster with a Molotov cocktail in it, then that doesn't say that the speaker's subjective intent is to threaten the reader or the viewer of the poster with- Yes? It appears to be- Whose home is it? Your Honor, and I think that what the government argued at trial, if I recall this correctly, was that it was the home of one of the alleged victims. I don't believe that that is the case. I don't believe it's an actual person's home. I don't believe it's a photograph of somebody's home. I don't believe that that's correct, Your Honor. If I were the person who lived in that home and this were mailed to me, I know you think that they didn't show that. Would that then be a true threat in your view? I think, Your Honor- I'm trying to figure out what the limits of your argument are. What if they showed my child going to school? Would that be a true threat? I think that if it showed a person's child with, for example, a firearm pointed at them, I think that would be- We know you have children, too. The same guy with the Molotov cocktail had a picture of the child. Is that a true threat to the child? With the person's child? Yes. I think that may make it more specific. So if the record does support the government's contention that this is the home of a victim, would your answer to the question change? Your Honor, I'm not sure that it would change because I think that there's another aspect to this. And I think there's the aspect of the threat of doxing, and that also brings in the potential threat of violence by third parties if somebody's address is exposed. And to the extent that it's predictive, for example, the threat being, if you continue to publish our members' information, we will publish your address, and then you will have this to worry about, I would respectfully submit that that is not a true threat. I don't have any problem with what you're saying. But this says your actions have consequences, and our patience has its limits, and there is a skeleton there with a Molotov cocktail in his hand. And if, in fact, that's in front of the house of one of the recipients, why isn't that just clearly a threat to that recipient? And I think that I would just respond by reiterating my analogy. I don't think that there's enough there to say that we, as an organization, are going to take this action, or I, as a person, as the sender of the poster, am going to take this action. And, again, I would just reiterate what the evidence of the actual stated intent was. It was to show the alleged victim, or the victims in this case, there's now been a conviction, that we have leverage over you. And, specifically, what they say is we can do to you what you have done to us. And those are all indications, not that the intention is to communicate we're going to come and we're going to attack you in your home, but what the subjective intent there we would submit is that we're going to expose your personal information and, therefore, you're going to have these types of issues to worry about. I know you wanted to save time, but Judge Gutierrez, did you have a question? I'd like to reserve the rest of my time. Thank you. Good morning, Your Honors. May it please the Court. Jonas Lerman for the United States. I'm happy to address any of the five claims, but I will start with the sufficiency claim, since that's where my friend on the other side spent his 15 minutes. This is not a close question, Your Honors. The evidence more than sufficed to support the jury's findings on both prongs of the true threats test. And my colleague, he's made a lot of arguments about inferences the jury should have drawn from the evidence. He and his co-counsel made the same arguments at trial, and the jury just didn't find those arguments credible. Was this a photo of one of the victims' actual home? Does the evidence support that? I don't recall that off the top of my head. My recollection is that it was sent to two victims. It was sent to the editor-in-chief of the Arizona Jewish magazine. It was posted on the – so it wasn't mailed to her. It was actually pasted on the outside of the window of her child's bedroom. And then it was also sent to the regional director of the Anti-Defamation League. One of the two victims, my recollection has testified that, yes, I believe that's my house in the picture. But in any event, you know, these were all arguments made to the jury about, you know, were they subjectively threatening? What was Mr. Cole's true subjective intent? And just like in the Kaiser case, which we cite in our brief, you know, the defense had an innocent explanation for all of this, and the jury heard that argument. And just like in Kaiser, which involved a case of a man sending fake anthrax through the mail, and his defense at trial was, I wasn't trying to actually threaten. I was trying to promote a book that I have coming out about the threat of anthrax and so forth. And the jury heard that defense and rejected the argument. Same thing here. You know, my colleague on the other side, they made all these arguments. The jury heard all this evidence. Notably, the jury also heard Mr. Cole in his own words in the recorded, you know, the undercover recording, the recording from the Nuclear Congress of Atomwaffen Division leaders. And so they got to hear Mr. Cole describing his role in this plot and what he hoped it would achieve. And in addition to the statements that you've already highlighted in your comments to my opposing counsel, I would also point you to Exhibit 701, which was the audio recording that Mr. Cole posted online to his followers in Atomwaffen Division, where he complained about nosy reporters. And he said, quote, we must approach them with nothing but pure aggression. We cannot let them think that they are safe in our very presence alone. Also, the undercover recording from his house in Texas, a few weeks before the search warrant was executed there. That's Exhibits 200 through 204. He describes the goal of the plot, including, you know, he said that he wanted the recipients of these posters to feel like, quote, we know where you live, don't F with us. And then sure enough, that was the same language that appears on one of the posters. He described the victims wanting to have the same feeling as the victim in that prior operation where there was the ragdoll tacked to the tree. So this is really not remotely like Bagdasarian on its facts. And among other reasons, because as Judge Hurwitz said, the recipient of the threat there never actually received it. Barack Obama, a U.S. senator then running for president, is not remotely comparable to the journalists and nonprofit leaders here. On the point about conditional threats that my colleague made, even if this threat or some of these posters could be viewed as conditional, that doesn't change the analysis. And this court made that clear in Sutcliffe, that in fact, most unprotected threats are conditional. Because the whole point is that they're designed to accomplish something where the threatener doesn't have to follow through. And this court said that the conditional nature of the statement doesn't make it any less of a threat just because there may be a contingency involved. I'm happy to answer any other questions on the sufficiency claim. But since I've got some time on the clock, I'm also happy to address the other claims if you have any questions on those, Your Honors. All right. If there are no other questions, I'll submit. Thank you very much. Thank you. I would just touch very briefly on some of the points that the government made. For example, Mr. Cole's statements on the recording about the rag dolls and the argument in relation to conditional threats or not. With respect to the conversations about the rag dolls, we would submit, number one, there were a lot of ideas discussed in these chats. And some of these ideas were very much overboard. Some of the ideas were even laughed at by group recipients. They were said in a joking manner. We would submit that ultimately the fact that rag dolls were not, in fact, used during this campaign would cut against the weight of that particular evidence. And I think, again, it's important to look to Mr. Cole's subjective intent and what he kept saying throughout both the chats and the undercover recordings. And what he said was, you don't want to overshoot it. In fact, he had expressly said, we don't want to go to somebody's house and we don't want to say, I'm going to kill you. That was not his intent. And, in fact, there is a point in the undercover recordings where he expressly said, legally, this is not a threat. But does his subjective understanding of the law have any relevance here? Let's assume that I engage in a classic true threat, but I don't think the law prohibits that kind of threat. I think it only prohibits a different kind of threat. I'm not sure what his subjective belief that this didn't violate the law, what relevance it has. Your Honor, I think that the relevance is that there were, this is something that was thought about and that there were, I think, steps being taken in the belief that what I am doing, what we are doing, is not a true threat. And I think that that's immensely important to Mr. Cole's subjective intent in this case, because the fundamental distinction between a true threat and a non-true threat, and this Court's precedents and the Supreme Court's precedents have made clear, is the subjective intent of the defendant. And it's our position that the subjective intent of the defendant, Mr. Cole and other members of conspiracy, as stated in those chat logs and undercover recordings, was to make the threat of doxing, of exposing people's personal information, not the threat that they actually intended to go to anybody's home and attack them in their homes. I think that's all I have in rebuttal, unless Your Honor is having other questions. It doesn't appear that we do. Thank you very much, both sides, for your helpful arguments this morning. The matter is submitted, and that is our last case set for argument on the calendar. So we are going to be in recess until tomorrow morning. Thank you. All rise. Thank you. The Court stands in recess until tomorrow. Thank you.
judges: NGUYEN, HURWITZ, Gutierrez